**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **MAKARA S. M.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:18-CV-00219-BH** |
| | § | |
| **NANCY BERRYHILL, ACTING,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Consent** |

## MEMORANDUM OPINION AND ORDER

By order of reassignment dated April 9, 2018 (doc. 16), with consent of the parties, this case has been transferred for the conduct of all further proceedings and the entry of judgment. Before the Court is *Plaintiff's Brief*, filed June 8, 2018 (doc. 20), and *Defendant's Brief*, filed July 9, 2018 (doc. 21). Based on the relevant findings, evidence, and applicable law, the Commissioner's decision is **REVERSED** and **REMANDED**.

## I. BACKGROUND[1]

### A. Procedural History

Makara S. M. (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claims for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act. (doc. 1.) On November 21, 2014, Plaintiff applied for DIB and SSI, alleging disability beginning on July 1, 2014. (R. at 225, 229.) Her claims were denied on February 27, 2015, and upon reconsideration

---

[1]  The background information is summarized from the record of the administrative proceeding, which is designated as "R."

on November 3, 2015. (R. at 135-39, 142-47.) On November 9, 2015, she requested a hearing before an Administrative Law Judge (ALJ). (R. at 148-49.) She appeared and testified at a hearing on September 27, 2016. (R. at 33-82.) On March 15, 2017, the ALJ issued a decision finding that she was not disabled and denying her claim for benefits. (R. at 12-32.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on April 19, 2017. (R. at 220-21.) The Appeals Council denied her request for review on November 28, 2017, making the ALJ's decision the final decision of the Commissioner. (R. at 1-7.) Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

## B. Factual History

### 1. Age, Education, and Work Experience

Plaintiff was born on December 31, 1970, and was 45 years old at the time of the hearing before the ALJ. (R. at 40.) She had completed one year of college and could communicate in English. (R. at 44.) She had past relevant work as an interpreter, an owner/manager in retail, a nurses' aide, and a sales clerk. (R. at 69-71.)

### 2. Medical Evidence

On July 23, 2013, Plaintiff presented to nurse practitioner (NP) Paula Spanos with symptoms of depression and anxiety. (R. at 372-74.) She reported that her symptoms began when her mother passed away in May 2013. (R. at 373.) She also reported feeling tightness in her chest and head when stressed or anxious. (*Id.*) While noted as being depressed and tearful, she appeared oriented and well-developed with normal mood and affect. (R. at 374.) NP Spanos noted that Plaintiff's score of 15-20 on the Generalized Anxiety Disorder 7-item scale signified severe anxiety symptoms, and she assessed Plaintiff with depressive disorder. (R. at 373-74.) She prescribed Prozac and

referred Plaintiff for mental health counseling. (R. at 374.)

Plaintiff returned to NP Spanos between April 28, 2014 and June 30, 2014. On April 28, 2014, Plaintiff reported that her symptoms of depression and anxiety had been "more severe," and she was also experiencing difficulty sleeping. (R. at 413-16.) She felt better when she was on Prozac, but stopped taking it in January 2014, because it caused her to eat a lot. (R. at 415.) She was prescribed Zoloft for her depression and Trazodone for her insomnia. (R. at 415-16.) When she returned for a follow-up on May 30, 2014, she reported sleeping better, but her mood remanded unchanged, and she felt very anxious and irritable. (R. at 408-11.) NP Spanos noted that Plaintiff's depressive disorder was poorly controlled, but stable, and increased her daily dosage of Zoloft. (R. at 410-11.) On June 30, 2014, Plaintiff reported feeling better and believed that the medications were working "very well." (R. at 406-08.) She was attending weekly counseling sessions and working with a case manager, which she considered very helpful. (R. at 408.)

On June 6, 2014, Plaintiff met with her case manager (CM), Mark Simmons.[2] (R. at 656.) She stated that her current significant stressors were legal, financial, and housing challenges, as well as having to deal with her past trauma. (*Id.*) CM Simmons initiated a treatment plan with Plaintiff, and met with her on multiple occasions in June 2016. (R. at 629-56.)

On June 11, 2014, Plaintiff presented to licensed clinical social worker (LCSW), Keita Whitten, for a psychosocial assessment. (R. at 594-600, 622.) She complained of feeling overwhelmed and anxious and reported experiencing panic attacks and insomnia. (R. at 622.) Her mother had told her that she was born "cursed," which was why her sons had mental disorders. (R. at 595.) Her father was killed when she lived in Cambodia, and she would experience flashbacks

---

[2] CM Simmons initially acted as Plaintiff's case manager, but began treating her in his capacity as a licensed therapist in May 2016. (R. at 64.)

of past trauma from her time there.  (*Id.*)  She felt isolated and scared. (R. at 599.)  LCSW Whitten noted that Plaintiff had a hard time trusting people and would be stubborn at times, but she was also "extremely resilient."  (R. at 622.)  She was diagnosed with PTSD, bereavement, and adjustment disorder with limited anxiety and depressed mood.  (R. at 599.)

On September 23, 2014, Plaintiff presented to LCSW Whitten for her first 90-day review. (R. at 613.)  She had a better understanding of her depression and anxiety, and was starting to feel less concerned about what others thought of her.  (*Id.*)  She said she felt "liberated now that [her] mother ha[d] passed."  (*Id.*)

On September 24, 2014, NP Spanos noted that Plaintiff's depressive disorder was poorly controlled. (R. at 403-06.)  Plaintiff reported having a hard time sleeping and felt that her medications were not effective.  (R. at 405.) Her store had closed and she was struggling financially. (*Id.*)  She also stated that her counselor diagnosed her with PTSD and encouraged her to seek short term disability. (R. at 405-06.)  She reported feeling very sad and anxious and struggled getting up in the morning, but she denied any suicidal ideation.  (R. at 405.) Her Zoloft dosage was increased, and her insomnia medication was switched from Trazondone to Mirtazapine. (*Id.*)

On November 3, 2014, CM Simmons issued a statement supporting Plaintiff's request for extended government assistance benefits.  (R. at 249.)  He noted that she was referred to counseling by her doctor "due to a worsening of her depressive and post traumatic symptoms as well as a significant deterioration in her daily functioning," and that he had worked with her for over seven months.  (*Id.*)  He reported that she had "worked diligently toward her goals," but "continue[d] to struggle with financial matters and exacerbated mental health stressors."  (*Id.*)  He also reported that she "ha[d] been unable to obtain employment in the current job market."  (*Id.*)

On November 17, 2014, Plaintiff presented to NP Spanos and reported experiencing a "very slight improvement" in her mood and sleeping better since the medication adjustment. (R. at 400-01.) She still felt "very depressed," however, and her case worker was helping her find a psychiatrist. (R. at 400-01.) NP Spanos assessed her depressive order as severe and poorly controlled. (*Id.*)

On November 18, 2014, LCSW Whitten issued an opinion recommending that Plaintiff be "except[ed] from any and all work requirements, or duties at this time." (R. at 395.) She reported that she had been working with Plaintiff since June 2014, and had been visiting with her for cognitive behavioral and somatic experiencing (SE) therapy on a weekly basis. (*Id.*) She noted that Plaintiff was diagnosed with PTSD, as well as with secondary markers of mixed anxiety and depressed mood with bereavement, and was a "Cambodian child refugee survivor of the Khmer Rouge genocide." (*Id.*) She had been exhibiting "surmounting signs of depression and panic attacks after experiencing a series of recent losses," which included the death of her mother, the separation from her husband, the loss of her business, and having to provide for four children, including two with Autism and Asperger syndrome. (*Id.*) LCSW Whitten opined that these events resulted in her having a "mental overload," which would require "slow and complicated" mental health intervention with her and her family. (*Id.*) She concluded that "[Plaintiff] and her children are sound candidates to receive SSI at this time in their process of recovery." (*Id.*)

On November 25, 2014, Plaintiff presented to psychiatrist Reinaldo de los Heros, M.D., for an initial comprehensive psychiatric evaluation. (R. at 493-504.) She complained of feeling "very agitated and moody." (R. at 493.) She described her childhood in Cambodia during a tyrannical regime, in which she witnessed people being murdered and brutalized, and experienced flashbacks

associated with her traumatic past. (*Id.*) She would try to block them out but would panic when she could not avoid them. (*Id.*) She also described suffering from "rapid mood swings" and an eating disorder. (*Id.*) While sleeping, she experienced restlessness in her legs. (*Id.*)

Plaintiff reported that she would suffer from "panic attacks on a daily basis, out of the blue," which made her feel "very distressed, very panicky, shortness of breath, shaky, nauseated, and dizzy." (R. at 493.) Dr. de los Heros noted that she also suffered from agoraphobia, and would avoid crowds, standing in lines, or being around people "for fear of going into a state of panic." (*Id.*) He observed Plaintiff as being alert, cooperative, and relatable, but also appearing tense and nervous. (*Id.*) He reported her cognitive exam being grossly intact and her insight and judgments as fair. (*Id.*) He assigned her a Global Assessment of Functioning (GAF) score of 45.[3] (R. at 494.) Dr. de los Heros diagnosed Plaintiff with PTSD, cyclothymia, panic disorder, agoraphobia, restless leg syndrome, and binge eating disorder. (*Id.*)

On December 27, 2014, Plaintiff visited LCSW Whitten for a second 90-day review. (R. at 620-21.) She reported losing her business and was stressed about providing for her family. (R. at 620.) LCSW Whitten noted that she was responding well to SE therapy. (R. at 621.)

On January 12, 2015, Plaintiff presented to NP Spanos for a follow-up visit. (R. at 397-99.) She reported feeling better on her current medication regimen and had been seeing improvement with her anxiety and depression. (R. at 398.) NP Spanos noted that her depressive disorder was still "severe and poorly controlled," but had improved under care of a psychiatrist. (R. at 399.)

---

[3] GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health. *Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001). A GAF score of 40 to 50 represents serious symptoms, such as suicidal ideation and severe obsessional rituals, or a major impairment in several areas, such as work and school. *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* ("DSM–IV–TR") p. 34 (4th ed. 1994).

On February 6, 2015, LCSW Whitten submitted a letter supporting Plaintiff's request for disability. (R. at 427.) She described Plaintiff and her family as being "a complicated case requiring up to 4 [therapy] sessions per week." (*Id.*) She noted that Plaintiff was in the process of reconciling her traumatic history, but continued to feel abandoned and overwhelmed. (*Id.*) She opined that Plaintiff would need "disability for at least one year in order to remain consistent and active with ongoing psychological and physical treatment interventions." (*Id.*) LCSW Whitten issued a similar opinion on September 15, 2015, in support of Plaintiff's request for long-term disability. (R. at 508.)

On February 13, 2015, Plaintiff visited Dr. de los Heros and was noted as being more stable and coping better with stress. (R. at 482.)

On February 27, 2015, Brian Stahl, Ph.D., a state agency psychological consultant (SAMC), reviewed Plaintiff's treatment records and completed a Psychiatric Review Technique Form (PRTF) and a consultative mental Residual Functional Capacity (RFC) assessment. (R. at 87-91.) In the PRTF, Dr. Stahl determined that Plaintiff had "severe" anxiety and depression but did not satisfy the diagnostic criteria to meet or equal the requirements of listing 12.04 for "affective disorders," or listing 12.06 for "anxiety-related disorders." (R. at 88.) He opined that Plaintiff had mild limitations in her activities of daily living; had moderate limitations in maintaining social functioning and concentration, persistence, and pace; and had experienced no episodes of decompensation of extended duration. (*Id.*) He considered Plaintiff's assessment of her symptoms "partially credible," but opined that the psychological extent of cognitive difficulties were not reflected in the medical evidence on file. (R. at 89.)

In his mental RFC assessment, Dr. Stahl opined that Plaintiff did not have any limitations with respect to memory and understanding. (R. at 89-90.) With respect to limitations of sustained

concentration and persistence, he opined that she was "moderately limited" in the following abilities: carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted by them; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 90.) He opined that she would be "able to work in 2 hour blocks performing simple tasks over the course of a normal workday/workweek." (*Id.*) He noted her social interaction limitations as being "markedly limited" in the ability to interact appropriately with the general public, and moderately limited in the ability to accept instructions and respond appropriately to criticism from supervisors. (R. at 90.) He opined that she would not be able to work with the public currently, but could work with coworkers and supervisors, and that she was moderately limited in the ability to respond appropriately to changes in the work setting but would be able to adapt to simple changes. (R. at 90-91.)

On April 1, 2015, Dr. de los Heros visited with Plaintiff and noted that she had a good response to Cymbalta. (R. at 473.)

On June 9, 2015, NP Spanos completed a medical source statement regarding Plaintiff's physical abilities to do work-related activities. (R. at 511-14.) She opined that Plaintiff did not have any exertional, postural, manipulative, or visual/communicative limitations based on her medical impairments. (R. at 511-13.) Her ability to maintain attention and concentration on work tasks throughout an eight-hour day would be significantly impaired, however, and she would likely be off task 15 to 20% of an eight-hour work day. (R. at 513.) Her PTSD and depression would

"significantly affect her cognition, memory, and ability to perform tasks of daily life." (R. at 514.) In light of Plaintiff's fibromyalgia, PTSD, depression, and suicidal thoughts, NP Spanos opined that she should not operate dangerous machinery and should avoid working near hazards. (*Id.*)

Plaintiff presented to Dr. de los Heros for multiple therapy sessions between June and November of 2015. On June 16, 2015, he reported that her mood was stable and she was less depressed. (R. at 462.) On July 14, 2015, it was noted that she had good results with Alprazolam and reported experiencing less panic and anxiety. (R. at 458.) On September 8, 2015, she reported "doing well now that [her] children were back in school." (R. at 583.) On November 6, 2015, Dr. Heros noted that Plaintiff had been better at controlling her anxiety and was experiencing less panic. (R. at 578.)

On October 5, 2015, SAMC Thomas Knox, Ph.D., affirmed Dr. Stahl's PRTF assessment. (R. at 114-17.) He also reached the same conclusion with respect to Plaintiff's RFC assessment, except he opined that her ability to carry out detailed instructions was "markedly limited" rather than "moderately limited." (R. at 116.)

On December 22, 2015, Dr. de los Heros completed an employability form from the Additional Support for People in Retraining and Employment - Temporary Assistance for Needy Families (ASPIRE-TANF) program that requested information regarding Plaintiff's limiting medical conditions and the adjustments necessary to accommodate her conditions in the work environment. (R. at 564-65.) Dr. de los Heros noted her diagnoses of panic disorder, PTSD, social phobia, mood swings, and binging. (R. at 564.) For work related activities, he opined that Plaintiff could only stand and walk, sit, and alternate between sitting and standing, in one and a half to two hour segments. (*Id.*) When not in acute distress due to exacerbation from PTSD and panic disorder, she

could manage simple grasping, pushing, pulling, fine manipulation, and reaching above shoulder level. (*Id.*) He noted that his opinions should be considered "in context of her unpredictable panic disorder." (*Id.*) He also noted that her limitations began "since childhood." (*Id.*) When asked to provide functional limitations, Dr. de los Heros responded with her GAF score of 45. (*Id.*)

Dr. de los Heros also completed a doctor's statement form in connection with Plaintiff's request for general assistance from the City of South Portland. (R. at 568-69.) He opined that she was unable to work at a regular job, seek work, attend school or classes, or do city workfare regardless of any limitations. (R. at 568.) He also opined that she was "so disabled that she should apply for disability benefits," but was unable to predict the length of time she would not be able to work. (R. at 568-69.) He thought she would benefit from retraining or education, but must do so "at her own pace due to the fact that she suffered from unpredictable or idiopathic severe and frequent emotionally crippling panic attacks." (R. at 569.) For Plaintiff to become "work-ready," she would need to "gradually work toward getting first mental rehabilitation, then educational, and then vocational rehab when able to take that step." (*Id.*)

On January 5, 2016, Dr. de los Heros reported that Plaintiff had been "dealing with stress better." (R. at 559.) On February 19, 2016, she reported experiencing fewer problems with depression. (R. at 553.) She also reported that her anxiety and moodiness was being well-managed with Gabapentin. (R. at 553.)

On March 15, 2016, Dr. de los Heros noted that Plaintiff had been doing well since coming off anti-depressants. (R. at 547-48.) She was still taking Gabapentin, which had helped with "anxiety, sleep, further mood stabilization, and chronic neuropathic knee pain." (R. at 547.) Her past PTSD had improved with supportive therapy. (*Id.*) Plaintiff was "euthymic in her mood" and

observed as being "hopeful, optimistic, and jovial." (*Id.*) She denied any suicidal or homicidal ideation and did not present with any hallucinations or delusions. (*Id.*) Dr. de los Heros described her thought processes as being "organized with abstraction and tight association." (*Id.*) Her cognitive exam was "grossly intact," her memory functions were "grossly adequate," and she was "oriented x3." (*Id.*) Her attention, concentration, language, and fund of knowledge were all intact, and opined that she had "very good" insight and judgment. (*Id.*)

On March 27, 2016, Plaintiff presented to LCSW Whitten for her third 90-day review. (R. at 614-15.) She stated that SE therapy was helpful, and she had been able to manage daily tasks with less worry and anxiety. (*Id.*) She reported a 50% reduction in her anxiety. (R. at 615.)

Plaintiff continued seeing Dr. de los Heros for psychological treatment between March and July of 2016. On March 29, 2016, Plaintiff reported that she continued to do well with her current medication. (R. at 546.) It was noted that she was "thankful that we are helping her quality of life by treating issues which used to give her a lot of pain." (*Id.*) She was also grateful for the support she had been receiving from her therapist and case worker. (*Id.*) Dr. de los Heros assessed her with generalized anxiety, but noted that her major depressive disorder was in remission and her panic disorder was "much improved." (*Id.*)

On April 12, 2016, Plaintiff reported doing better, but was worried that her cognition and memory were starting to fail. (R. at 545.) Dr. de los Heros opined that her cognition and memory might be impacted by her medication regime, which he adjusted. (*Id.*) Nevertheless, he noted that her cognitive exam was grossly intact and she continued to exhibit good abstract reasoning, memory functions, and insight and judgments. (*Id.*) When she returned to Dr. de los Heros on April 26, 2016, she reported doing "a lot better" since the adjustment to her medication. (R. at 541.) She had

"managed to come off her alprazolam for her panic attacks and [was] doing much better with her moods and her depression." (*Id.*)

On May 24, 2016, she reported having "periods of panic attacks," but had low anxiety. (R. at 539.) Dr. de los Heros noted that she had been working as an advocate for women's rights and considered her "functioning at a high level cognitively." (*Id.*) On June 7, 2016, he noted that she continued to show good response to medication and treatments and opined that her prognosis was "good with continued treatment." (R. at 537-38.)

On June 21, 2016, Dr. de los Heros completed a second ASPIRE-TANF employability form for Plaintiff. (R. at 536.) When asked to rate her cognitive skills, Dr. de los Heros checked-off the "markedly limited" blanks for the following activities: remember work location and work procedures; carry out instructions; maintain attention and concentration; perform activities within a schedule; sustain an ordinary routine; and interact with the general public. (*Id.*) He reported her as being diagnosed with PTSD, panic disorder, and cyclothymic disorder. (*Id.*) In response to a request for functional limitations, Dr. de los Heros noted that she would be "unable to work due to unpredictable anxiety episodes/panic anxiety." (*Id.*) Nevertheless, for work accommodations, he opined that she should be referred for vocational training rehabilitation and should attempt to finish her college degree. (*Id.*)

On July 5, 2016, Plaintiff presented to Dr. de los Heros for a follow-up. (R. at 534.) She reported being able to deal with panic attacks and had been doing well with counseling. (*Id.*) Dr. de los Heros noted that she was "still disabled but stable and more accepting of her predicament." (*Id.*) He performed a mental status examination and noted that she was alert, cooperative, and demonstrated good eye contact. (*Id.*) He also noted that she related well throughout the interview,

and there was no evidence of psychomotor agitation or retardation. (*Id.*) He described her mood and effect as euthymic and her speech as normal. (*Id.*) Her thought processes were "linear and goal-oriented with no evidence of thought disorder." (*Id.*) She denied suicidal and homicidal ideation, hallucinations, or delusions. (*Id.*) Dr. de los Heros opined that she was oriented and had "adequate" memory functions, "good" insight and judgments, and "good" cognition, and her prognosis was "good with continued treatment." (*Id.*)

### 3. Hearing Testimony

On September 27, 2016, Plaintiff, CM Simmons, and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 33-82.) Plaintiff was represented by an attorney. (R. at 35.)

#### a. Plaintiff's Testimony

Plaintiff testified that she was separated from her husband and lived with her four children, ages 6, 10, 16, and 19. (R. at 40.) Her oldest two children were autistic and had special needs. (*Id.*) They received some government assistance and lived in a one-bedroom apartment. (R. at 42-43.) She had a driver's license but no car and would use public transportation to get around. (R. at 44.) Her community aide gave her a ride to the hearing. (*Id.*) She attended college in Boston for one year in 1989, and studied behavioral health at the local community college in 2001 to learn more about autism to take care of her children. (*Id.*) She owned a grocery store with her husband from 2007 to 2013, and had three employees. (R. at 44-45.) She went to Cambodia when her mother was diagnosed with cancer. (R. at 45.) When she came back to the United States, she had to close her store because it was abandoned by her employees when they opened their own store. (R. at 45-46.) She tried to reopen her store in early 2014, but could not because of a landlord dispute. (*Id.*)

In 2002, Plaintiff worked for a convalescence home as a certified nurses' aide. (R. at 46-47.)

She also worked full-time for a department store as a cashier. (R. at 47.)  In 2016, she would occasionally work as an interpreter for doctor's offices and other companies.  (*Id.*)  During the beginning of the summer of 2016, she would work up to four to five hours a week, and from June to August, 2016, she worked two hours a day.  (R. at 47-48.)  In July 2016, she worked with a patient that caused her to panic and suffer a breakdown, which resulted in her wrecking her car. (R. at 48-49.)  She eventually stopped working because she was scared of driving and meeting patients, and was worried it would trigger her anger. (R. at 49.)

Plaintiff's mood had not been the same since her mother passed away. (R. at 49.)  She had been unable to work because of her mood and feelings of guilt and sadness.  (*Id.*)  She had "lost everything" in the last few years, including her store, her mother, her husband, and the home she had lived in for ten years. (R. at 49-50.)  She was taking six different medications. (R. at 50.)  After her mother passed away, she started experiencing back aches and "all joint pain," as well as sensations of tingling and burning in both of her legs from the knees down.  (*Id.*)  She would occasionally fall when walking, and would be unable to feel her feet after going up stairs.  (*Id.*)

She did not have much free time during the day, but would usually take warm baths to relax her muscles after her children would leave for school.  (R. at 50-51.)  Her children would help with preparing meals.  (R. at 51.)  She would usually volunteer at the community center for an hour on Thursdays because it was when the center provided free bread and vegetables. (R. at 51-52.)  She would walk around the neighborhood on the weekends, and sometimes would attend a movie or dinner hosted at the community center.  (R. at 52.)  She would go to the grocery store with her two older sons or with someone from the community center.  (*Id.*)  Her eldest son did the laundry most of the time. (R. at 53.)  She enjoyed crocheting but did not have the time to do it.  (*Id.*)

During panic attacks, Plaintiff would experience heart racing, sweaty hands, headaches, and blackouts. (R. at 56.) She reported having two to three panic attacks a week, which usually occurred in public places. (R. at 57.) Because she would lose track of time when blacking out during a panic attack, she avoided leaving the house. (*Id.*) She also experienced panic attacks while speaking on the phone, and would usually cry and hang up the phone. (R. at 58.) She did not want to stay at home and would like to continue working as an interpreter, but she struggled with meeting patients and showing up on time. (R. at 59.) She had trouble sleeping and would have a hard time getting out of bed. (R. at 59-60). When she last worked, she worked two hours a day and then returned home and took a bath. (R. at 60-61.) She then lay on the couch or in bed because her body was so tired that she could "hardly move." (R. at 61.) Her working also affected her children because she was not in a good mood when they came home. (R. at 61.)

Out of her 45 family members in Cambodia, Plaintiff and her mother were the only two that were able to escape the war. (R. at 61-62.) When her mother was alive, she would call Plaintiff four or five times a day to check on her. (R. at 62.)

### b.    *Case Manager/Therapist's Testimony*

CM Simmons testified that he was a mental health therapist. (R. at 64.) He had been in the mental health field for the past six years, and had been a licensed therapist since 2015. (*Id.*) He had known Plaintiff for two and a half to three years. (*Id.*) He first worked with Plaintiff as her case manager, and became her therapist beginning in May 2016. (*Id.*)

CM Simmons worked with Plaintiff in relation to her PTSD, which he regarded as "chronic and severe." (R. at 65.) He also worked with her in an effort to obtain employment, and had seen her stress and symptoms worsen, and her coping deteriorate. (R. at 65.) Plaintiff was increasing her

15

isolation by spending a lot of time at home, and she had discontinued driving because she would have severe flashbacks while driving. (*Id.*)

CM Simmons opined that Plaintiff was able to present well for a time; she was a very polite and passionate person. (*Id.*) Going out into the community would take an extraordinary toll on her, however. (*Id.*) She would not be capable of performing full-time employment because she would become disassociated and lose time during the day, and this would occur a couple of times a week. (R. at 66-67.) She also experienced unpredictable blackouts. (R. at 67.) He opined that the strain of a 40-hour work week would likely lead her to psychiatric hospitalization. (R. at 66.)

### c.  VE's Testimony

The VE classified Plaintiff's past relevant work as interpreter (sedentary, SVP-6), retail manager/owner (light, SVP-7), nurse's aide (medium, SVP-4), and sales clerk (light, SVP-3). (R. at 69-71.) The VE considered a hypothetical person with Plaintiff's age, education, and work experience with the following limitations: must avoid tasks involving a variety of instructions or tasks; could understand to carry out simple one or two-step instructions; could understand to carry out detailed, but uninvolved written or oral instructions involving a few concrete variables and from standardized situations; could work in two-hour blocks performing simple and not complex tasks over the course of a normal workday and work week; and not work with the public currently, but could work with coworkers and supervisors. (R. at 71-72.) Such an individual could not perform any of Plaintiff's past work because it involved working with people and was beyond simple one and two-step instructions and tasks. (R. at 72.) This hypothetical person could perform other work as a housekeeping cleaner, which was classified by the *Dictionary of Occupational Titles* (DOT) as light with an SVP of 2 with 400,000 jobs available nationally; a laundry worker II, which was

classified by the DOT as medium with an SVP of 2 with 38,000 jobs available nationally; and a dishwasher, which was classified by the DOT as medium with an SVP of 2 with 290,000 jobs available nationally. (R. at 72-73.) This testimony was consistent with the DOT. (R. at 73.)

If the same hypothetical person was occasionally unable to meet "routine attendance requirements of work," which would be six to eight days out of a 20-day work month where the individual would be late getting to work, would have to leave work early, or would not work at all, this person would not be able to perform other work because employers would not tolerate such inconsistent attendance, based on the VE's job placement experience. (R. at 73-74.)

## C.    ALJ's Findings

The ALJ issued her decision denying benefits on March 15, 2017. (R. at 12-32.) At step one,[4] she determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of July 1, 2014, and she continued to meet the disability insured status requirements through September 30, 2014. (R. at 14-15.) At step two, she found that the medical evidence established that Plaintiff had a severe combination of the following impairments: PTSD, panic disorder, and cyclothymia. (R. at 15.) At step three, the ALJ concluded that Plaintiff's severe impairments or combination of impairments did not meet or equal the requirements for presumptive disability under the listed impairments in 20 C.F.R. Part 404. (R. at 16.)

Before proceeding to step four, the ALJ determined that Plaintiff retained the RFC to perform a full range of work at all exertional levels with the following limitations: must avoid tasks involving a variety of instructions or tasks, but able to understand to carry out simple one or two-step instructions, and understand to carry out "detailed but uninvolved" written or oral instructions

---

[4] The five-step analysis used to determine whether a claimant is disabled under the Social Security Act is described more specifically below.

involving a few concrete variables in or from standardized situations; could work in two-hour blocks performing simple (not complex) tasks over the course of a normal workday/workweek; and not work with the public currently, but could work with coworkers and supervisors. (R. at 19.)

At step four, the ALJ determined that Plaintiff was unable to perform any past relevant work. (R. at 24.) At step five, the ALJ relied upon the VE's testimony to find her capable of performing work that existed in significant numbers in the national economy. (R. at 25.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from her alleged onset of disability date of July 1, 2014, through the date of the decision. (R. at 26.)

## II. LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program

is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *Id.*

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 189, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" will not be found to be disabled.

4. If an individual is capable of performing the work he had done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v)(2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by VE testimony, or other similar evidence. *Froga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he or she cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## III. MEDICAL OPINIONS

In her only issue for review, Plaintiff argues that the ALJ failed to give proper weight to her treating source opinions when determining her RFC. (doc. 20 at 8.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386–87 (5th Cir. 1988) (per curiam). It "is an assessment of an individual's ability to do sustained work-related

physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1. The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1.

## A.     Treating Physician

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. §§ 404.1520b(b) and 404.1527(c) (2017). Every medical opinion is evaluated regardless of its source. *Id*. at § 404.1527(c)(1). Generally, an opinion from an examining source is given more weight than the opinion from a non-examining source. *Id*. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id.* § 404.1527(c)(2).

If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory

findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* § 404.1527(c)(1)-(6). The "standard of deference to the examining physician is contingent upon the physician's ordinarily greater familiarity with the claimant's injuries. . . . [W]here the examining physician is not the claimant's treating physician and where the physician examined the claimant only once, the level of deference afforded his opinion may fall correspondingly." *Rodriguez v. Shalala*, 35 F.3d 560, 1994 WL 499764, at *2 (5th Cir. 1994) (unpublished) (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)). A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). If the evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* at 455; *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981) (per curiam).

A factor-by-factor analysis is unnecessary when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Newton,* 209 F.3d at 458. "[A]bsent reliable medical evidence from a treating or examining physician *controverting the claimant's treating specialist*, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [20 C.F.R. § 404.1527(c)]." *Id.* at 453

(emphasis added).  While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ.  *Id.* at 455.

The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision, or all the evidence that he rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record.  *Leggett*, 67 F.3d at 564.  Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings."  *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted).  The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the [ALJ's] findings."  *Id*. (citations omitted)  Courts may not re-weigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision.  *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, the ALJ determined that Plaintiff had the following nonexertional limitations: avoid tasks involving a variety of instructions or tasks, but able to understand to carry out simple one or two-step instructions, and understand to carry out "detailed but uninvolved" written or oral instructions involving a few concrete variables in or from standardized situations; could work in two-hour blocks performing simple (not complex) tasks over the course of a normal workday/workweek; and not work with the public currently, but could work with coworkers and

supervisors. (R. at 19.)  In making her RFC determination, the ALJ specifically referenced the medical evidence from Dr. de los Heros and identified him as her treating psychiatrist.  (R. at 23) She explicitly gave "great weight" to his June 2016[5] opinion that Plaintiff had "moderately limited ability to remember work locations and procedures, carry out instructions, maintain attention and concentration, perform activities within a schedule, sustain an ordinary routine, and interact with the general public," and that "she should be referred to vocational training and finish her college degree." (*Id.*)  She found the opinion "generally consistent with the record as a whole, including the mental status examination findings, the treatment required and received, the reported activities of daily living, and the State agency assessments." (*Id.*)

The ALJ attributed little to no weight to Dr. de los Heros's other medical opinions, however. (R. at 23.)  She gave "little weight" to his August 11, 2015 opinion that Plaintiff would be able to remember and comprehend when not experiencing an unpredictable, recurrent, and severe episode of PTSD because his statements were "somewhat vague in nature," and "he [did] not state when or how often the claimant [was] not under her 'rather unpredictable, recurrent, and severe case of post-traumatic stress disorder.'" (*Id.*)  She referenced a December 22, 2015 employability form he completed in which he opined on Plaintiff's physical limitations when she was not in acute distress due to exacerbation from post-traumatic stress and panic disorders. (*Id.*)  She gave this opinion "no weight" because Dr. de los Heros did not examine or treat Plaintiff's physical impairments, and he was not medically qualified to assess her physical impairments. (*Id.*)  The ALJ also considered an employability form that Dr. de los Heros completed on the same day, but gave it "little weight" because it was inconsistent with his June 2016 opinion "that she be referred for vocational training

---

[5] Although the ALJ noted the date of this opinion as June 2, 2016, it was actually dated June 21, 2016. (*See* R. at 23, 536.)

and finish her college degree." (*Id.*) She finally referenced Dr. de los Heros's clinical notes on July 5, 2016, in which he stated that Plaintiff was "still disabled but stable." (*Id.*) She attributed "no weight" to this statement because it was "inconsistent with the moderate limitations cited just a month earlier in June, 2016," and noted that final determinations of disability were reserved for the Commissioner. (*Id.*)

The ALJ gave "great weight" to an opinion that Plaintiff had moderately limited abilities in certain mental activities, which she attributed to Dr. de los Heros's June 2016 opinion. (R. at 23.) As reflected in the record, however, Dr. de los Heros actually opined that Plaintiff was "markedly limited" in those abilities, not "moderately limited." (R. at 536.) Although the ALJ expressly considered Dr. de los Heros's opinion and explained the weight attributed to it, her evaluation was based on a mischaracterization of his assessment of Plaintiff's mental abilities. (*See* R. at 23-24.) This was factual error. *See Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992) (finding an ALJ's mistaken reliance on an improper medical record was reversible error); *see also Little v. Berryhill*, No. 3:17-CV-00328, 2018 WL 3406876, at *8 (S.D. Tex. June 25, 2018), *adopted by* 2018 WL 3388877 (S.D. Tex. July 12, 2018) (finding reversible error when the ALJ's decision to assign little weight to the opinion of a claimant's longstanding treating physician was based in large part on the ALJ's incorrect statements of the record).

## B.    Harmless Error

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required," and a court "will not vacate a judgment unless the substantial rights of a party are affected." *Mays v. Bowen*, 837 F.2d 1362, 1363-64 (5th Cir. 1988). "[E]rrors are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's

decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). For example, an ALJ's significant reliance on serious factual mistakes or omissions, would render the finding of "no disability unsupported by substantial evidence." *Randall*, 956 F.2d at 109; *see also Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) ("A reversal and remand may be required . . . if the ALJ based the decision on serious factual mistakes or omissions."). In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811 (E.D. Tex. Nov. 28, 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)). Accordingly, to establish prejudice that warrants remand, Plaintiff must show that the proper consideration of Dr. de los Heros's opinion evidence might have led to a different decision. *See id.* at 816 (citing *Newton*, 209 F.3d at 458).

In her decision, the ALJ stated that she "considered evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927" (R. at 19), which required her to give "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s)" controlling weight. 20 C.F.R. § 404.1527(c)(2). She gave "great weight" to an inaccurate account of Dr. de los Heros' opinion that Plaintiff had "moderately limited ability to remember work locations and procedures, carry out instructions, maintain attention and concentration, perform activities within a schedule, sustain an ordinary routine and interact with the general public." (R. at 23.) She found this opinion well-supported and consistent with the medical record. (*Id.*) As Dr. de los Heros was the only treating physician that specifically offered an opinion regarding Plaintiff's ability to perform certain mental activities in the work environment, it is clear that the ALJ attributed controlling weight to his opinion.

Given the significance attributed to treating source opinions by the Social Security

Regulations, it is impossible to ignore the impact that the ALJ's factual error had on her RFC evaluation and disability determination. *See generally* 20 C.F.R. § 404.1527. In fact, the Commissioner acknowledged that "[t]he ALJ considered this opinion when she found that Plaintiff must avoid tasks involving a variety of instructions or tasks, but is able to understand to carry out simple one or two-step instructions, and understand to carry out detailed but uninvolved' written or oral instructions involving a few concrete variables in or from standardized situations." (doc. 21 at 16.) Although there were other medical sources in the record, Dr. de los Heros's opinions were the only treating source opinions on Plaintiff's mental impairments. The ALJ used the mischaracterized opinion to discredit his other opinions, specifically noting its inconsistency with his opinions from December 22, 2015, and July 5, 2016. (R. at 23.)

If the ALJ had noted Dr. de los Heros's "markedly limited" opinion, she might have found it inconsistent with the record and limited the weight given to his opinion. With no treating source opinion on Plaintiff's mental limitations, she might have also ordered a consultative physical evaluation, re-contacted Dr. de los Heros for clarification, or request additional evidence. *See* 20 C.F.R. § 404.1520b(b) (explaining that to resolve inconsistency or insufficiency, the Commissioner may re-contact medical source, request additional evidence, or order a consultative examination). Although the SAMCs found Plaintiff "moderately limited" in many of the abilities Dr. de los Heros considered "markedly limited," "when the reports of non-examining physicians constitute the sole medical evidence presented," their opinions do not provide substantial evidence to support an ALJ's RFC. *Villa v. Sullivan*, 895 F.2d 1019, 1023-24 (5th Cir. 1990). Even if the ALJ attributed no weight to Dr. de los Heros's June 2016 opinion, "as a matter of law, the opinions of the non-examining physicians, though referenced by the ALJ, cannot rise to the level of substantial

evidence to support the limited weight given to [a treating physician's] opinions." *Smith v. Colvin*, No. 1:14CV195-SA-DAS, 2016 WL 762693, at *14 (N.D. Miss. Feb. 25, 2016) (citing *id.*)).

Although the record shows that Plaintiff's symptoms had improved with treatment (R. at 20), it is not inconceivable that the ALJ would have included additional or more restrictive mental limitations in Plaintiff's RFC assessment had she considered Dr. de los Heros's opinion of Plaintiff's "markedly limited" abilities. *See Conte v. Comm'r, SSA*, No. 4:16-CV-00048-CAN, 2017 WL 1037570, at *7 (E.D. Tex. Mar. 16, 2017) (finding the ALJ's improper consideration of a treating source opinion was not harmless error when there was no contrary opinion from a treating source in the record). Further, a more restricted RFC would have impacted the VE's testimony, and a different conclusion might have been reached regarding Plaintiff's disability status. Even if the ALJ attributed no weight to Dr. de los Heros's June 2016 opinion, it is not the duty of the reviewing court to "substitute its judgment of the facts for the ALJ's, speculate on what the ALJ could have done or would do on remand, or accept a *post hoc* rationalization." *See Benton v. Astrue*, No. 3:12-CV-0874-D, 2012 WL 5451819 at *8 (N.D. Tex. Nov. 8, 2012); *see also Newton*, 209 F.3d at 455 (explaining that the Commissioner's decision must stand or fall with the reasons stated in the ALJ's final decision). "Just as the court may not accept explanations not offered in the ALJ's opinion, it cannot ignore or 'disregard statements made by the ALJ' in support of the decision." *Smith*, 2016 WL 762693, at *14 (quoting *Randall*, 956 F.2d at 109).

In conclusion, Plaintiff's RFC was based on the ALJ's erroneous assessment of the medical evidence. The ALJ's error was not harmless because it is not inconceivable that she would have reached a different decision had she properly considered and weighed Dr. de los Heros's June 2016

assessment.[6] *Randall*, 956 F.2d at 109 (reversing an ALJ's decision where the ALJ relied on a negative EMG for a third person, when claimant's EMG showed bilateral radiculopathy); *Little*, 2018 WL 3406876, at *8 (finding error not harmless when the ALJ's reason for rejecting the mental limitations assessed by the claimant's treating physician was based on the ALJ's factually inaccurate description of the record).

## IV.  CONCLUSION

The Commissioner's decision is **REVERSED** and **REMANDED** for reconsideration.

**SO ORDERED** this 26th day of March, 2019.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[6]  Because this factual error requires remand, it is unnecessary to consider whether this case must be remanded on the other grounds raised by Plaintiff.